JAMES A. & JUDITH A. PERRY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Perry v. Commissioner
Docket No. 6284-79.
United States Tax Court
T.C. Memo 1981-134; 1981 Tax Ct. Memo LEXIS 616; 41 T.C.M. (CCH) 1135; T.C.M. (RIA) 81134; March 23, 1981. Judith A. Perry and James A. Perry, pro se. Nancy Herbert, Rose A. Mendes, and Conley G. Wilkerson, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable years of 1974 and 1975 in the amounts of $ 1,255 and $ 652, respectively. The sole issue presented is whether petitioner Judith A. Perry is entitled to exclude certain payments from gross income as a scholarship or fellowship under section 117. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and attached exhibits are incorporated herein *617 by this reference. Petitioners resided in Westerville, Ohio, at the time they filed the petition herein. They filed their Federal income tax returns for the years 1974 and 1975 with the office of the Internal Revenue Service, Los Angeles, California. On June 19, 1972, petitioner Judith A. Perry [2] graduated from Loma Linda University School of Medicine in Loma Linda, California. She became licensed to practice medicine in the State of California in early 1973. From June 1972 through June 1973, she was an intern specializing in psychiatry at the Loma Linda University Medical Center (the Medical Center), a hospital affiliated with her alma mater. On January 18, 1973, petitioner entered into a written agreement for post-doctoral training in psychiatry with the Medical Center. The agreement covered the period of July 1, 1973, through June 30, 1974. The Medical Center agreed to provide petitioner with meals while on duty, uniforms and laundry service, ten vacation days and seven holidays annually, professional liability insurance while within the scope of the training program, and hospitalization insurance *618 for her, her spouse, and children. It further agreed to provide a suitable environment for graduate medical educational experience and a training program which would meet the standards of the appropriate specialty board. Petitioner agreed to perform satisfactorily and to the best of her ability the usual and customary services of a physician on the appointed service, to conform to the hospital rules, and not to engage in outside professional activities without prior approval. On June 17, 1974, petitioner entered into a similar agreement with the Medical Center covering the period of July 1, 1974, to June 30, 1975. [3]
In July 1973, petitioner began her residency in psychiatry at the Medical Center. In February 1974, petitioner applied for adminission to Loma Linda University Graduate School, Department of Psychiatry, to be dmitted to the Master of Science Program in psychiatry. [4] Her application stated that she was not applying for a scholarship or fellowship and that her expenses would be met with private funds. Admission to this program was limited to resident physicians in psychiatry. *619 on June 15, 1975, petitioner received the degree of Master of Science in psychiatry from Loma Linda University. The Loma Linda Psychiatric Group (LLPG) was a partnership which was the private practice mechanism for the members of the Department of Psychiatry of Loma Linda University. It was the legal predecessor of Loma Linda Psychiatric Medical Group, Inc. (LLPMG), which was incorporated on July 10, 1975. During 1974, petitioner received $ 11,376.24 from the Medical Center and $ 8,246.25 from LLPG. Petitioners claimed on their tax return that $ 3,600 received by Judith Perry from the Medical Center in 1974 did not constitute taxable income. During 1975, petitioner received $ 15,858.97 from the Medical Center, $ 5,253.75 from LLPG, and $ 1,111.82 from LLPMG. Petitioners claimed on their tax return that $ 1,800 received by Judith Perry from the Medical Center did not constitute taxable income. Attached to their returns for both years *620 was a letter from the Medical Center stating that the amounts subsequently excluded by petitioners were scholarship or fellowship grants under section 117. [5]
OPINION This case was presented to the Court in two stages. At the initial trial in Columbus, Ohio, it appeared to both respondent and this Court that the issue presented was whether petitioners were entitled to exclude $ 300 per month of the payments received from the Medical Center as a scholarship or fellowship under section 117. We then continued the case to enable the parties, primarily petitioners, to gather additional evidence as to the character of the payments from LLPG. At the subsequent trial session in Cincinnati, Ohio, the testimony and exhibits, which were liberally and patiently accepted, shed little additional light on the controversy. It appears from the *621 record that petitioners recognize that the payments from the Medical Center were for services and were not entitled to the exclusion. [6] The trial focussed on the question whether the exclusion should apply to the payments from LLPG. [7]
The dispute in this case centers, not on what the law relating to scholarships and fellowships is, but on how the law applies to the facts of the instant case. The test to be applied under the regulations is whether the primary purpose for making the payments *622 to petitioner was to educate and train her in her individual capacity or, on the other hand, whether the payments were to compensate her for her past, present, or future services or represent amounts paid for services subject to the direction or supervision of the grantor. Section 1.117-4(c), Income Tax Regs.; Weinberg v. Commissioner, 64 T.C. 771, 776 (1975). In Bingler v. Johnson, 394 U.S. 741, 751 (1969), the Supreme Court sustained the validity of section 1.117-4(c) of the regulations, emphasizing that its thrust is to deny an exclusion for payments given in return for a quid pro quo, as distinguished from "relatively disinterested, 'no-strings' educational grants." Each case must be resolved on the basis of its own facts and circumstances. Cooney v. United States, 630 F.2d 438, 442 (6th Cir. 1980). Our focus is not on the purpose of the program, but on the purpose of the payments. Rosenthal v. Commissioner63 T.C. 454, 460 (1975). After a careful review of the record, bearing in mind that the burden of proof is on the petitioners, [8]Rule 142(a), Tax Court Rules of Practice and Procedure, we are unable *623 to conclude that the payments by LLPG were intended as a "no-strings" educational grant rather than as compensation for services. The record is sparse as to the character of the payments from LLPG. Petitioner claims that the only requirement for receiving these payments was that she be enrolled in the masters program in psychiatry. She explained that LLPG received funds not only from the private practice of the faculty, but it also collected funds from other sources for the students. Yet, the only corroborating evidence which she provided, a letter from Harrison S. Evans, M.D., [9] stated merely that LLPG was the private practice mechanism of the Department of Psychiatry and that, in return for her stipend, petitioner was "to attend assigned classes, seminars, and scheduled service rotations set up in the regular graduate student/resident training program." On this record, it is impossible to determine the extent to *624 which petitioner performed or was expected to perform services for LLPG in return for her stipend. Due to the manner in which this issue was presented, [10] we are unwilling to accept petitioner's substantially uncorroborated testimony, and she has not produced sufficient other evidence in support of her position. The two letters from Dr. Evans are too vague to sustain a finding in her favor. [11] We are left completely in the dark as to the nature of the services under the "scheduled service rotations set up in the regular graduate student/resident training program." If services were rendered, they would not qualify under section 117, whether they were rendered for LLPG or the Medical Center. Moreover, we know that LLPG was closely intertwined with the psychiatry department. Yet, we do not know the extent to which the former was used to carry out petitioner's training in the latter. There is absolutely nothing in the record from which *625 we can find whether activities performed for the Medical Center are separable from those paid for by the funds from LLPG. [12] Nor do we know whether all resident/graduate students received this or any other "stipend" from LLPG. Finally, we have no idea whether LLPG could have done without the services provided by the residents/graduate students. See Proskey v. Commissioner, 51 T.C. 918 (1969). There are simply too many questions left unanswered for us to find that petitioners have carried their burden of proof that the primary purpose of the payments was to educate Judith Perry and that no strings were attached. *626 Decision will be entered for the respondent. Footnotes
1. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Future references to petitioner will refer to Judith A. Perry.↩
3. This agreement included additional benefits and specified the stipend to be received.↩
4. Petitioner's transcript states that she entered graduate school in September 1973. It indicates that she commenced taking graduate courses for credit in summary 1972. Nonetheless, she did not apply for admission until February 1974.↩
5. The labels placed on payments by third parties are not binding on us. See Nino v. Commissioner, T.C. Memo. 1980-204↩ n.8. There is no explanation in the record as to why petitioners limited the claimed exclusion to $ 300 per month, in view of the fact that petitioner was a candidate for a degree during the pertinent period.
6. We would have, in any event, found for respondent that the payments from the Medical Center did not qualify for the section 117 exclusion. Compare Cooney v. United States, 630 F.2d 438 (6th Cir. 1980); Adams v. Commissioner, 71 T.C. 477 (1978) (contractual relationship); Dietz v. Commissioner, 62 T.C. 578 (1974) (resident in psychiatry); Herrera v. Commissioner, T.C. Memo. 1979-345 (resident in psychiatry); White v. Commissioner, T.C. Memo. 1978-109↩ (Loma Linda University Medical Center). 7. The payments from LLPMG were for services rendered subsequent to the completion of petitioner's residency.↩
8. Petitioners' brief indicates that they believe that, in certain respects, the burden of proof is on the respondent, which is simply not the case.↩
9. Dr. Evans was president of LLPMG and chairman of the Department of Psychiatry, Loma Linda University.↩
10. See pp. 5-6, supra↩. 11. Both letters constitute hearsay and were admitted over respondent's objection because of the peculiar circumstances of the case. Such admission did not, however, bind us to accord them any particular weight.↩
12. One of Dr. Evans' letters, which stated that approximately 25 percent of petitioner's time was spent in masters program-related activities, is self-serving and entitled to little or no weight. See notes 5 and 11, supra. It is also unclear; we do not know whether the 25 percent applies to all of her time, the LLPG time, or the Medical Center time. Finally, it may well be irrelevant, because an allocation has been denied in a similar context. See Burstein v. United States,     Ct. Cl.    , 622 F.2d 529↩ (1980).